**\*\*\* FOR PUBLICATION IN WEST'S HAWAIʻI REPORTS AND PACIFIC REPORTER \*\*\***

**Electronically Filed
Supreme Court
SCWC-22-0000740
15-JUL-2026
10:20 AM
Dkt. 31 OPC**

IN THE SUPREME COURT OF THE STATE OF HAWAIʻI

---o0o---

DANIEL R. GRANILLO,
Petitioner/Petitioner-Appellant,

vs.

STATE OF HAWAIʻI,
Respondent/Respondent-Appellee.

SCWC-22-0000740

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-22-0000740; CASE NO. 2PR191000004)

JULY 15, 2026

CONCURRING OPINION BY GINOZA, J.,
IN WHICH CIRCUIT JUDGE KUBOTA, JOINS

I concur that Daniel R. Granillo's (**Granillo**) petition under Hawaiʻi Rules of Penal Procedure (**HRPP**) Rule 40 should be granted and that he is entitled to a new trial.  However, I disagree with the standard adopted by the majority for

determining whether a new trial is required in cases like this. I write separately to set forth my reasoning and my view on the applicable standard under prevailing Hawaiʻi law.

## I.  Brief Background

In 1989, Granillo was charged with one count of kidnapping, two counts of sexual assault in the first degree, and one count of attempted sexual assault in the first degree. At trial in 1990, Wayne W. Oakes (**Oakes**), a supervisory special agent with the Federal Bureau of Investigation (**FBI**), was qualified as an expert in the area of hair and fiber analysis. There was no objection to Oakes being qualified as an expert or to his testimony. Oakes' testimony provided forensic evidence, based on his analysis of a head hair found in Granillo's vehicle and fibers found on the complaining witness's (**CW**) underwear, to link Granillo to the alleged crimes against the CW. Granillo was found guilty on all charges.

Twenty-seven years later, in a letter dated October 2, 2017, the U.S. Department of Justice (**DOJ**) informed the Prosecuting Attorney for the County of Maui that it had reviewed the laboratory reports and testimony of FBI Laboratory examiners "in cases involving microscopic <u>hair</u> comparison analysis" (**DOJ Letter**). (Emphasis added.) The DOJ Letter explained that the DOJ had determined:

> the microscopic <u>hair</u> comparison analysis testimony or laboratory report presented in this case <u>included statements that exceeded the limits of science in one or more of the following ways and were, therefore, **invalid**</u>: (1) the examiner stated or implied that the evidentiary hair could be associated with a specific individual to the exclusion of all others – this type of testimony exceeded the limits of the science; (2) the examiner assigned to the positive association a statistical weight or probability or provided a likelihood that the questioned hair originated from a particular source, or an opinion as to the likelihood or rareness of the positive association that could lead the jury to believe that valid statistical weight can be assigned to a microscopic hair association – this type of testimony exceeded the limits of the science; or (3) the examiner cites the number of cases or hair analyses worked in the laboratory and the number of samples from different individuals that could not be distinguished from one another as a predictive value to bolster the conclusion that a hair belongs to a specific individual – this type of testimony exceeded the limits of the science.

(Emphases added.)  The letter further stated that the DOJ was notifying the defense in this case.

In early 2019, relying in part on the 2017 DOJ Letter, Granillo initiated filings under HRPP Rule 40 asserting that Oakes' testimony had been improper and Granillo was entitled to a new trial.  At a hearing before the Circuit Court of the Second Circuit (**Rule 40 Court**), Granillo also (apparently for the first time) asserted that Oakes' testimony on fiber was not proper under a "National Academy of Sciences" study that showed that hair and fiber evidence cannot provide a conclusive match. The Rule 40 Court held that based on the DOJ Letter, Oakes' testimony on the hair evidence was erroneously admitted because it exceeded the bounds of science.  Applying a harmless beyond a reasonable doubt standard, the Rule 40 Court denied Granillo's

Rule 40 petition, explaining its view that there was overwhelming evidence against Granillo.

## II. Parts of Expert Oakes' Testimony Has Now Been Shown to Exceed the Limits of Science

I agree with the harmless beyond a reasonable doubt standard applied by the Rule 40 Court, and that there was significant evidence against Granillo. However, I further conclude that aspects of Oakes' expert testimony on both the hair and fiber evidence have now been shown to exceed the limits of science. Under the harmless beyond a reasonable doubt standard, I conclude the record establishes there is a reasonable possibility that Oakes' testimony that went beyond the limits of what current science supports contributed to Granillo's conviction.

This case, however, poses several challenging issues, especially regarding the proper treatment of Oakes' testimony on fiber evidence. It is concerning that the 2017 DOJ Letter only reviewed and discredited statements by expert Oakes on the hair evidence. That letter disclosed that the DOJ and the FBI conducted an internal review of FBI Laboratory examiners' reports and testimony in cases involving microscopic hair analysis. The DOJ noted that, in some cases, FBI Laboratory examiners exceeded the limits of science by "overstating the conclusions that may appropriately be drawn from a positive

association between evidentiary hair and a known hair sample." This, it clarified, was "in contrast to cases in which the FBI Laboratory report and examiner testimony presented conclusions that may appropriately be drawn from a positive association."

Here, Oakes was an FBI supervisory special agent and testified as to the hair and fiber evidence. Oakes testified that he was employed with the FBI for twelve-and-a-half years, received specialized training and was certified by the Director of the FBI, and that he had been assigned to the hairs and fibers division of the laboratory division headquarters for the last nine-and-a-half years. With respect to Oakes' hair testimony, the DOJ Letter stated: "the <u>microscopic hair comparison analysis testimony</u> or laboratory report presented in this case included statements that exceeded the limits of science . . . and were, therefore, invalid[.]" (Emphasis added.)

The DOJ Letter did not address the testimony about fibers in this case at all. There is nothing in the record to explain this. This is even more baffling because the National Research Council stated in 2009 — eight years before the 2017 DOJ Letter — that fibers can be examined microscopically "in the same way as hairs, and with the same limitations." <u>See</u> Comm. on Identifying the Needs of the Forensic Sci. Cmty., Nat'l Rsch. Council, <u>Strengthening Forensic Science in the United States: A</u>

Path Forward, 161 (2009) (**2009 NRC Report**).  Given the eight-year gap between the 2009 NRC Report and the 2017 DOJ Letter, it is certainly curious why the DOJ neglected to consider, in 2017, the only other forensic evidence in this case by FBI agent Oakes, particularly given that Oakes explained he did "the same type of microscopic examination" for both hair and fiber.  Eight years earlier, the 2009 NRC Report had also already stated that "[f]iber examiners agree[]. . . that none of these [fiber] characteristics is suitable for individualizing fibers (associating a fiber from a crime scene with one, and only one, source) and that fiber evidence can be used only to associate a given fiber with a class of fibers."  Id. (emphasis added) (footnote omitted).  Did the DOJ Letter's failure to address the fiber evidence in this case indicate that there was disagreement with the 2009 NRC Report or that different scientific principles may apply to fiber?  Moreover, nothing prohibited the parties from clarifying with the DOJ as to the validity of the fiber evidence in this case.  In sum, the record lacks the DOJ's input as to whether certain portions of Oakes' fiber testimony would be appropriate under the current scientific limitations of forensic evidence.  Understandably then, particularly given that the DOJ Letter referenced only hair evidence and the minimal argument on the fiber evidence before the Rule 40 Court, that

court ruled that only Oakes' testimony about the hair evidence had been improper.

With arguments more sharply focused on appeal regarding both hair and fiber evidence, and detailed review and argument about the 2009 NRC Report, I agree that parts of Oakes' expert testimony on fiber have also been shown to exceed now acceptable scientific limits. Specifically, Oakes' testimony that fibers located in the CW's underwear were "microscopically identical" with fiber samples from a seat in Granillo's vehicle was improper. Likewise, Oakes' testimony that fibers from the CW's pants were "microscopically the same" as the fibers found on the floor of Granillo's vehicle was also improper. The 2009 NRC Report established that the only reliable conclusion regarding the comparison of fibers is that the fiber could be associated with a <u>class</u> of fibers. Subsequent legal commentary supports the 2009 NRC Report. <u>See</u> Katie Kronick, <u>Forensic Science and the Judicial Conformity Problem</u>, 51 Seton Hall L. Rev. 589, 598-600 (2021) (stating the 2009 NRC Report addressed how problems can occur with respect to many forensic science fields, including "exaggerating results on the witness stand" and further noting "<u>the only reliable conclusion regarding comparisons of fibers and paints is that the fibers or paint could have come from the same type of item</u>" (emphasis added) (footnote omitted)); Russell D. Covey, <u>Suspect Evidence and</u>

Coalmine Canaries, 55 Am. Crim. L. Rev. 537, 540, 560, 565 (2018) (observing that "visual or microscopic" fiber comparison has been subject to "criticism for [its] demonstrated unreliability" and highlighting that "there is a growing recognition" that it "has been used in misleading ways, that forensic experts have consistently overstated comparison results, and that convictions based on that evidence are potentially unreliable" (emphases added) (footnote omitted)).

Oakes' testimony, however, included other findings that may not be implicated by scientific limits. Without the DOJ's input, it is difficult to conclude, based on this record, that the entirety of Oakes' testimony exceeded the limits of science, for two reasons: (1) the 2009 NRC Report concluded fiber evidence can be used to associate a given fiber with a class of fibers, 2009 NRC Report, at 161; and (2) certain aspects of Oakes' testimony could be admitted based on the prevailing scientific consensus that the fibers collected in this case could have come from the same class of fibers as in Granillo's vehicle. Oakes' testimony regarding discovery of foreign fibers in the CW's underwear and on her pants could appropriately be relevant to class evidence, that is, that the fibers discovered from the CW's clothing were consistent with the same class of fibers found in Granillo's vehicle because they exhibit similar microscopic characteristics. Under

appropriate circumstances, an expert at a retrial might be able to present such class evidence.

In United States v. Protho, the Seventh Circuit relied on the 2009 NRC Report to admit a fiber expert's testimony, that evidentiary fiber collected from the victim was "consistent" with a known sample collected from the defendant, because that testimony "stayed within reliable scientific bounds." 41 F.4th 812, 820-22 (7th Cir. 2022), cert. denied, 143 S.Ct. 465 (Mem) (2022); see id. at 821 (stating the 2009 NRC Report "has concluded that fiber analysis can produce class evidence, meaning that it can show whether two fibers may have come from the same type of garment, carpet, or furniture" (emphases added) (citations and internal quotation marks omitted)). Protho dealt with a defendant's conviction for kidnapping and assault of a minor. Id. at 819. The expert's methodology was as follows:

> to compare two fibers to determine consistency with one another, a forensic scientist uses five methods in sequential order, stopping if she finds two fibers inconsistent: (1) view two samples side-by-side in the same visual field with high-powered microscopes; (2) use controlled light settings to observe the orientation of polymers on a fiber's axis; (3) illuminate light wavelengths to observe color and intensity of fluorescence; (4) compare the intensity of a fiber's light absorption at different wavelengths against a known spectra; and (5) analyze the fiber's chemical composition through infrared light.

Id. at 820 (emphasis added). Using this methodology, the expert compared fibers recovered from the defendant's vehicle with fibers obtained from clothing the victim wore on the day of the

9

kidnapping and testified that the fibers "were consistent[.]" Id. at 820-21. Notably, the expert "acknowledged that her results could not definitively identify fibers as coming from the same source. Indeed, [the expert] disclosed that fiber analysis can never associate a single item to the exclusion of all others and that consistency alone is not a means of positive identification." Id. at 821 (emphases added) (internal quotation marks omitted). The Seventh Circuit noted it did not doubt the trial court's conclusion that the "relevant scientific community has generally accepted this type of fiber analysis." Id. at 822.

Here, given that Granillo will have a new trial, expert testimony on fibers would be admissible as class evidence, provided the expert appropriately limit such testimony, like the fiber expert did in Protho. In this regard, aspects of Oakes' testimony could be treated as class evidence. The evidence indicates "green acrylic textile fibers" were found on the CW's underwear, and similar green acrylic textile fibers were recovered from the seat cover from Granillo's vehicle. Likewise, "marine acrylic fibers" were found on the CW's pants, and similar marine acrylic fibers were recovered from the seat cover from Granillo's vehicle. An expert should be allowed to testify that those foreign fibers were "consistent with" the fibers from Granillo's seat covers (the known sample). In other

words, the fibers collected from the CW's clothing <u>could have</u> <u>come</u> from the <u>same type</u> of garment, carpet, or furniture found in Granillo's vehicle.  Like the expert in <u>Protho</u>, however, an expert at a retrial would have to clarify that consistency does not mean that the fibers definitively came from the same source and that other sources can be excluded.

### III.  The Harmless Beyond a Reasonable Doubt Standard Should Apply

I would hold that the Rule 40 Court properly applied the harmless beyond a reasonable doubt standard.  However, I conclude that the aspects of Oakes' testimony on hair and fiber evidence that went beyond currently acceptable scientific limits was not harmless.  Given the record in this case, there is a reasonable possibility that Oakes' testimony in this regard contributed to Granillo's conviction.  See <u>State v. Veikoso</u>, 126 Hawai'i 267, 276, 270 P.3d 997, 1006 (2011) ("[T]he error must be examined in the light of the entire proceedings" and "[i]n that context, the real question becomes whether there is a reasonable possibility that error might have contributed to conviction." (citation and internal quotation marks omitted)).

I agree with the majority that the newly discovered evidence standard under <u>State v. McNulty</u> does not apply in cases like this, where it is later determined that certain evidence should not have been admitted in the first place.  60 Haw. 259,

267-68, 588 P.2d 438, 445 (1978), <u>overruled on other grounds by</u> <u>Raines v. State</u>, 79 Hawai'i 219, 900 P.2d 1286 (1995), <u>and</u> <u>State</u> <u>v. Eberly</u>, 107 Hawai'i 239, 112 P.3d 725 (2005).

This situation is different from new evidence cases, where the alleged newly discovered evidence, if admitted at a retrial, would change the outcome. <u>McNulty</u> involved a murder conviction where the defendant shot and killed the victim. <u>Id.</u> at 260, 588 P.2d at 441. The defendant raised a self-defense claim. <u>Id.</u> In seeking a new trial, the defendant argued he had discovered new evidence with respect to the victim's extremely aggressive and violent nature. <u>Id.</u> at 267, 588 P.2d at 445. <u>McNulty</u> held that a motion for a new trial based on newly discovered evidence will only be granted if:

> (1) the evidence has been discovered after trial; (2) such evidence could not have been discovered before or at trial through the exercise of due diligence; (3) the evidence is material to the issues and not cumulative or offered solely for purposes of impeachment; and (4) <u>the evidence is of</u> <u>such a nature as would probably change the result of a</u> <u>later trial</u>.

<u>Id.</u> at 267-68, 588 P.2d at 445 (emphasis added) (citation omitted). Applying this standard, this court held the alleged newly discovered evidence was not new evidence because the defendant's trial counsel was aware of the information prior to trial. <u>Id.</u> at 268, 588 P.2d at 445. Thus, in <u>McNulty</u>, the question was not whether there was evidence that shouldn't have been admitted at trial. Instead, the inquiry focused on, *inter*

12

*alia*, whether there was newly discovered evidence that had not been admitted previously and whether that evidence would probably change the outcome of a later trial. See id. at 267-68, 588 P.2d at 445.

That is not the case here. In the realm of now discredited scientific evidence, experts generally render opinions at the time of trial that *were* believed to be scientifically grounded at the time but then are undermined by later scientific discoveries. See Ex Parte Warner, 721 S.W.3d 436, 445 (Mem) (Tex. Crim. App. 2025) (Finley, J., concurring) (denying application for writ of habeas corpus); see id. at 446 (stating scientific testimonies "that were correct based on the science as it was understood" are later "undermined (rendered misleading) by intervening scientific developments"). I therefore agree with the majority that the McNulty new evidence standard is inapplicable under these set of circumstances.

Where I part ways with the majority is their adoption of the false evidence "materiality" standard in this case. The majority adopts the materiality standard expressed in United States v. Butler, 955 F.3d 1052, 1057-58 (D.C. Cir. 2020), where the government conceded it knew or should have known that hair evidence was false at the time of trial. In those circumstances, the Butler court stated "[t]he sole question for us is whether the prosecution's use of the false hair testimony

13

against Butler was material" and further describing the standard "as establishing a veritable hair trigger for setting aside the conviction[.]" Id. (citations and internal quotation marks omitted). Here, the majority asserts the Butler materiality standard aligns with Hawai‘i case law and should apply in this case, citing State v. Stone, 147 Hawai‘i 255, 465 P.3d 702 (2020).

I disagree because Stone does not support application of the materiality standard. Rather, Stone applied the harmless beyond a reasonable doubt standard where the prosecutor was not aware a state's witness had falsely testified during trial. I would apply this court's on-point precedent in Stone, where: (1) false evidence was presented at trial, (2) the state did not know and had no reason to know about the false evidence during the trial, and (3) this court applied the harmless beyond a reasonable doubt standard to determine if a new trial was required. Instead, the majority cobbles reasons to side-step the pertinent standard applied in Stone. It adopts a higher materiality standard from Butler, a federal case that is factually distinguishable from this case because in Butler the government knew or should have known about the false evidence during trial.

In Stone, a police officer falsely testified that he had generated reports about property found on scene of an

14

arrest. Id. at 257-58, 465 P.3d at 704-05. The prosecutor did not know the officer's testimony was false before trial concluded, but this court held the defendant's "due process right to a fair trial was implicated by the lack of a correction of [the officer's] false testimony before conclusion of trial." Id. at 272, 465 P.3d at 719. Notwithstanding the due process implications, this court did not apply a materiality standard but rather applied the harmless beyond a reasonable doubt standard.

This court in Stone first analyzed whether a new trial was required under the following State v. Teves test:

> upon a proper and timely motion under Rule 33, HRPP, a new trial must be granted by the trial court when it decides that (1) it is reasonably satisfied that the testimony at trial of a material prosecution witness is false; (2) defendant and his agents did not discover the falseness of the testimony until after the trial; (3) the late discovery is not due to a lack of due diligence by defendant or his agent; **and** (4) the false testimony is not harmless because there is a reasonable possibility that it contributed to the conviction.

Id. at 270, 465 P.3d at 717 (quoting State v. Teves, 5 Haw. App. 90, 96, 679 P.2d 136, 141 (App. 1984)). Stone held that all four parts of the Teves test were met. Id. at 270-71, 465 P.3d at 717-18. Of note, even where the first part was satisfied — that there was false testimony by a material prosecution witness — the court in Stone properly required consideration of the fourth part of the Teves test, the harmless beyond a reasonable doubt standard. Id. at 271, 465 P.3d at 718. As to the

15

harmless beyond a reasonable doubt standard, the court in <u>Teves</u> stated:

> In criminal appeals the court's uninvited and unwaived error at trial is generally reversible at defendant's request <u>unless it is deemed harmless</u>. <u>We know of no reason why that standard should not be applied in situations involving the discovery after trial that a prosecution witness gave false testimony</u>. Under that standard the testimony is deemed not harmless if there is a reasonable possibility that it contributed to the conviction. The testimony is deemed harmless if beyond a reasonable doubt it did not contribute to the conviction.

<u>Teves</u>, 5 Haw. App. at 96, 679 P.2d at 141 (emphases added) (citations and footnote omitted).

This court in <u>Stone</u> further addressed the due process implications from the officer's false testimony not being corrected before trial concluded. There, where the State did <u>not</u> know the testimony was false during trial, this court held:

> The violation of Stone's right to a fair trial is <u>also subject to the harmless beyond a reasonable doubt analysis</u>. "[A] violation of a constitutional right is subject to the harmless-beyond-a-reasonable-doubt standard. This standard requires a court to '<u>examine the record</u> and determine whether there is a <u>reasonable possibility that the error complained of might have contributed to the conviction</u>.'" State v. Tetu, 139 Hawaiʻi 207, 225, 386 P.3d 844, 862 (2016) (citation omitted).

147 Hawaiʻi at 272, 465 P.3d at 719 (emphases added).

Hence, this court's decision in <u>Stone</u> involving false evidence requires application of the harmless beyond a reasonable doubt standard in circumstances like this case, which means examining the record and not just simply considering if the evidence in question was material. Indeed, material

evidence could be cumulative, could carry slight weight and/or there could be clear evidence to support conviction, such that there's no reasonable possibility the error complained of contributed to conviction. Apparently, under the majority's view of the materiality standard, none of that would matter because by applying the Butler materiality standard where it does not belong, this new standard establishes "a veritable hair trigger for setting aside the conviction." 955 F.3d at 1058.

A false evidence claim under the federal due process clause requires the prosecution to know of the evidence's falsity when it was used at trial, or the failure to correct it during trial when it appears. See Napue v. Illinois, 360 U.S. 264, 269 (1959). This was also recognized by this court in Birano v. State, 143 Hawai'i 163, 181, 426 P.3d 387, 405 (2018), where this court stated "it is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the constitutional dictates of due process. . . . The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." (Emphases added) (internal quotation marks omitted) (quoting Napue 360 U.S. at 269).

Here, the majority misapplies the Butler standard it adopts because there is no claim and no indication that the State knew or should have known that parts of Oakes' testimony

17

was false, or more accurately, that certain parts of Oakes' testimony would years later be deemed to exceed the limits of science.  Indeed, in 1997, seven years after Granillo's trial, this court recognized that "[t]he principles and procedures underlying hair and fiber evidence are overwhelmingly accepted as reliable[,]" and that "the scientific principles and procedures underlying hair and fiber evidence are well-established and of proven reliability[.]"  State v. Fukusaku, 85 Hawaiʻi 462, 473-74, 946 P.2d 32, 43-44 (1997).  There was no reason for the State to know otherwise during the trial in this case in 1990.

In Ex Parte Warner, the concurring opinion noted concerns about side-stepping the government's lack of knowledge as to later-discredited scientific evidence.  In that case, the concurring judge commented that the State is not "omniscient[,]" it cannot correct false evidence "that is demonstrably true, as far as any party or witness knows, *at the time of trial*."  721 S.W.3d at 445, 447 (questioning whether different standards of materiality should apply for knowing and unknowing use of false evidence).  That concurring judge further noted that the Supreme Court has "never held that an unknowing use of false evidence violates due process."  See id. at 443 (citing Glossip v. Oklahoma, 604 U.S. 226, 246 (2025) (authored by Justice Sotomayor and confirming that in Napue, "this [Supreme] Court

18

held that a conviction knowingly obtained through use of false evidence violates the Fourteenth Amendment's Due Process Clause. To establish a [Napue] violation, a defendant must show that the prosecution knowingly solicited false testimony or knowingly allowed it to go uncorrected when it appear[ed]." (last alteration in original) (citations and internal quotation marks omitted))).

Ironically, the majority takes issue with my citing the concurring opinion in Ex Parte Warner, apparently because it is not binding precedent. Butler, which the majority relies upon, is not binding on this court either. I cite Ex Parte Warner because the concurring opinion provides an insightful discussion about the federal standards for a false evidence due process claim, including discussion about Justice Sotomayor's recent opinion in Glossip. Contrary to the majority's assertion, my position is not based on the U.S. Supreme Court's construction of the federal due process clause. Rather, I point to federal cases because the majority adopts the materiality standard from Butler, a federal case, but misapplies it here where the State did not knowingly use false evidence. I maintain that this court should follow its own precedent in Stone and apply the harmless beyond a reasonable doubt standard,

rather than adopt the federal materiality standard under Butler, which is misapplied here.[1]

Rather than apply the false evidence materiality standard crafted for circumstances where the prosecution violates due process because it knowingly used or allowed false evidence, I would instead hold under the circumstances of this case that the Rule 40 Court correctly applied Hawai'i's harmless beyond a reasonable doubt standard. Given the evidence and record in this case, I reach the same conclusion as the majority that Granillo should have a new trial. However, in other cases, application of the materiality standard where the State did not knowingly use or allow false evidence could mandate a wholly unjust result.

The harmless beyond a reasonable doubt standard properly addresses a situation like this case where, without knowledge by the state and where there is no reason it should have known, evidence was admitted at trial and it is later determined the evidence exceeds the limits of science and should not have been admitted. In Veikoso, this court articulated the harmless beyond a reasonable doubt standard as follows:

> Regarding the erroneous admission of evidence by a trial court, this court has said that, even if the trial court erred in admitting evidence, a defendant's conviction will not be overturned if the error was harmless beyond a

---

[1] Although it is apparent, it is also worth noting that the majority voices disdain for recent United States Supreme Court rulings on issues that are not pertinent to this case.

> reasonable doubt. [State v. Machado], 109 Hawai'i [445,] 452, 127 P.3d [941,] 948 [(2006)] (internal quotation marks and citation omitted). Under this standard, the error is not to be viewed in isolation and considered purely in the abstract. *Id.* (internal quotation marks and citation omitted). Rather, the error must be examined in the light of the entire proceedings and given the effect which the whole record shows it to be entitled. In that context, the real question becomes whether there is a reasonable possibility that error might have contributed to conviction. *Id.* at 452-53, 127 P.3d at 948-49 (internal quotation marks and citation omitted).

126 Hawai'i at 276, 270 P.3d at 1006 (emphases added) (internal quotation marks and brackets omitted). Veikoso dealt with a defendant's sex assault and kidnapping convictions. Id. at 268, 270 P.3d at 998. There, the circuit court had erred by admitting a treating physician's testimony that the complaining witness told the physician about threats made by the defendant against her. Id. Even though the evidence was admitted in error, this court nonetheless concluded the error was harmless because there was "no possibility of a reasonable nature that the error contributed to [the defendant's] conviction." Id. at 283, 270 P.3d at 1013 (citation and internal quotation marks omitted).

Applying the harmless beyond a reasonable doubt standard here, the Rule 40 Court considered the record in-depth and concluded the evidence against Granillo was overwhelming, but did not consider the impact of the hair and fiber evidence. I recognize that the Rule 40 Court detailed compelling evidence against Granillo, and concluded that:

21

> [T]he record contains overwhelming and compelling evidence of physical injury, along with other corroborative testimony, that demonstrates the defendant's guilt beyond a reasonable doubt despite the erroneously-admitted evidence. Although the State concedes that two statements [regarding hair] offered into evidence during the testimony of Wayne Oakes were erroneously admitted, the Court concludes as a matter of law that this evidence was not the sole, or even the primary, evidence that Granillo sexually assaulted or physically harmed [the CW].

Indeed, the Rule 40 Court detailed significant evidence against Granillo. However, the court did not account for the significance of Oakes' now discredited hair and fiber testimony.

The Rule 40 Court identified a wealth of evidence from the 1990 trial tending to link Granillo to the offenses against the CW, as well as evidence tending to corroborate that the CW was abducted and suffered from physical injuries. However, specific hair and fiber testimony by expert Oakes, including his testimony that fibers found in the CW's underwear and on her pants were "microscopically identical" and "microscopically the same" as the fibers from Granillo's vehicle, reasonably contributed to Granillo's conviction. This was compelling evidence placing the CW in Granillo's vehicle and which corroborated her testimony. As is now known based on the subsequent 2017 DOJ Letter and the 2009 NRC Report, Oakes' testimony in this regard exceeded the limits of science. Moreover, Oakes' testimony about his credentials was also compelling, including that he was an FBI supervisory special agent, he had been employed with the FBI for twelve-and-a-half

years, and had an extensive background in the area of hair and fiber analysis.  He testified he had worked for nine-and-a-half years at the FBI's laboratory division headquarters, was specifically assigned to the hair and fibers division with ten other special agent examiners, and that they examined hairs and fibers that are submitted as evidence by state and federal law enforcement.  He further testified that he received specialized training in that field, served in the field and underwent a year of intensive training at the FBI's Virginia Academy, that he was ultimately certified by the Director of the FBI, that he devotes his entire worktime to this type of work in analysis, and that he had previously testified as an expert in the area.  As a result, and without any objection, Oakes was qualified at trial as an expert in the area of hair and fiber analysis.

Given the record in this case, I conclude Oakes' testimony that exceeded the limits of science was not harmless beyond a reasonable doubt and Granillo is entitled to a new trial.

Based on the foregoing, I respectfully concur.

/s/ Lisa M. Ginoza

/s/ Peter K. Kubota

